IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION


HARLEY McCURRY, III                                             PLAINTIFF

        v.                  Civil No. 2:20-cv-02004-PKH-MEF


ANDREW M. SAUL, Commissioner,
Social Security Administration                                  DEFENDANT

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Harley McCurry, III, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration ("Commissioner") denying his claims for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  42 U.S.C. § 405(g).

### I.        Procedural Background

Plaintiff filed his applications for benefits on July 13, 2017, alleging an onset date of January 1, 2015 due to diabetic neuropathy.  (ECF No. 10, pp. 14, 134-40, 145-48, 204-16).  Plaintiff was 45 years old on his alleged disability onset date, had at least a high school education, and was unable to perform past relevant work.  (ECF No. 10, p. 21).  The Commissioner denied his applications initially and on reconsideration.  (ECF No. 10, pp. 14, 134-40, 145-48).  At the Plaintiff's request, an Administrative Law Judge ("ALJ") held an administrative hearing on May

23, 2019.  (ECF No. 10, pp. 38-60).  Plaintiff was present and represented by counsel.  During the hearing, Plaintiff amended his alleged onset date to July 17, 2017.  (ECF No. 10, p. 43).

On June 28, 2019, the ALJ concluded that the Plaintiff's hypertension, insulin dependent diabetes mellitus with peripheral neuropathy, degenerative disc disease of the cervical spine, and major depression were severe, but concluded they did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  (ECF No. 10, p. 17).  He then found the Plaintiff capable of performing light work involving simple tasks, simple instructions, incidental contact with the public, and only occasional overhead reaching.  (ECF No. 10, p. 19).  With the assistance of a vocational expert, the ALJ found the Plaintiff could perform work as a marking clerk, routing clerk, and copy machine operator.  (ECF No. 10, p. 27).

The Appeals Council denied the Plaintiff's request for review on December 2, 2019.  (ECF No. 10, pp. 9-13).  Plaintiff then filed this action.  (ECF No. 1).  This matter is before the undersigned for report and recommendation.  Both parties have filed appeal briefs (ECF Nos. 13, 14), and the case is now ready for decision.

## II.     Relevant Evidence

The undersigned has conducted a thorough review of the entire record in this case and will recount the relevant evidence in this section.  In 2003, Plaintiff was diagnosed with Diabetes Mellitus Type II.  (ECF No. 10, p. 400).  In April 2017, Plaintiff's diabetes was being monitored, and the treating physician noted that his A1C levels had improved.  (ECF No. 10, p. 610).  Plaintiff attributed this improvement to watching his diet more carefully and getting plenty of exercise from working outside on fences.  (ECF No. 10, p. 610).  He reported having trouble with vision, including loss of, or darkening of vision, on a weekly basis.  (ECF No. 10, p. 611).  He reported experiencing tinnitus sometimes, but not very often, though he had been experiencing it for three

to four years.  He reported an angina about two or three weeks prior to this visit and that he spoke with his PC team about it.  He also experienced pedal edema after being on his ankles and feet all day.  He reported dyspnea on exertion.  He reported no difficulty with gait, but some difficulty in balance.  He had decreasing strength in the right shoulder and painful joints in bilateral ankles, right elbow, and right shoulder.  He reported no back pain, but problems with short term memory that he had to write things down.  (ECF No. 10, p. 612-13).

In May 2017, Plaintiff's HgbA1C was improved but still much too high.  (ECF No. 10, p. 601-02).  The treating registered nurse noted that Plaintiff's Metformin prescription had not been filled since January 2017, though Plaintiff stated he had been compliant with medication, including Metformin.[1]  (ECF No. 10, p. 601-02).

In June 2017, Plaintiff's blood sugars were stable.  His treating registered nurse advised him to continue Glargine, Novolog, and Metformin.[2]  Plaintiff was also encouraged to eat a diabetic diet and engage in daily exercise.  (ECF No. 10, p. 589-90).

In July 2017, the Plaintiff was seen in the Veterans Affairs Medical Center in Fayetteville, Arkansas.  (ECF No. 10, pp. 321-22).  A radiology report showed no acute abnormalities in the abdomen or pelvis, though Plaintiff had a history of diffuse abdomen pain.  (ECF No. 10, pp. 321-22).  Plaintiff also sought treatment for upper back pain and numbing in legs after standing for longer than two or three hours.  (ECF No. 10, p.  583).  He reported taking two or three shots of alcohol to be able to sleep at night and feeling so nauseated he could only eat crackers or rolls.

---

[1] Metformin is used to control high blood sugar.  *See* Metformin, at https://medlineplus.gov/druginfo/meds/a696005.html (last accessed January 4, 2021).
[2] Glargine is a long-acting, manmade version of human insulin used to treat diabetes.  *See* Glargine, at https://medlineplus.gov/druginfo/meds/a600027.html (last accessed January 4, 2021).  Novolog is a short-acting, manmade version of human insulin used to treat diabetes.  *See* Novolog, at https://medlineplus.gov/druginfo/meds/a605013.html (last accessed January 4, 2021).

(ECF No. 10, p. 583).  The treating physician discussed Plaintiff's diabetes and the need to abstain from alcohol use and eat a consistent diet.  (ECF No. 10, p. 583).

On July 31, 2017, Plaintiff was admitted for treatment of depressive disorder and suicidal ideation without specific plans or intent to act.  (ECF No. 10, pp. 345-56).  He complained of worsening depression and abdominal pain.  (ECF No. 10, p. 347).  His mental status exam showed fair grooming, good hygiene, alert and oriented cognitive function, good eye contact, and no abnormal motor activity.  He stated his mood as a little depressed, and the treating physician noted a full affect range.  He answered questions appropriately with clear, normal speech.  He denied suicidal thoughts and any hallucinations.  (ECF No. 10, pp. 348-49).  It was noted that Plaintiff responded well to the hospital course, participating in the ward milieu, team staffing, and community groups.  He stated that he felt improved, slept better, and was ready for discharge. (ECF No. 10, pp. 348-49).  Upon discharge, he completed a pain screen assessment and reported chronic, but not acute, foot pain at level three.  He declined pain management interventions at that time.  (ECF No. 10, p. 424).  At discharge on August 5, 2017, Plaintiff's blood sugar levels were improved.  He stated that his depression and anxiety were resolved, he had no complaints, and he was happy to be going home.  (ECF No. 10, p. 533).

In August 2017, Plaintiff sought treatment for severe abdominal cramps and uncontrolled adult-onset diabetes mellitus.  (ECF No. 10, pp. 353-54).  Plaintiff also had a psychiatric evaluation after his recent admission for depression with suicidal ideation.  (ECF No. 10, pp. 402-13).  He had since been started on Escitalopram and reported that his mood was better.[3]  (ECF No. 10, p. 402).  He reported that he had not had a depression free period in the past three years and that he had chronic leg and foot pain, making it difficult for him to stand and, thus, work many jobs.  (ECF

---

[3] Escitalopram is a selective serotonin reuptake inhibitor (SSRI) antidepressant.  *See* Escitalopram, at https://medlineplus.gov/druginfo/meds/a603005.html (last accessed January 4, 2021).

No. 10, p. 403).  However, he reported no pain present at this appointment and a pain score of zero.  (ECF No. 10, p. 410).  His active problems included major depression, diabetes mellitus, and shoulder pain.  His active prescriptions included Accu-chek Aviva, Escitalopram, Gabapentin, Insulin, Ketotifen, Metformin, and Ondansetron.[4]  (ECF No. 10, p. 404).  Plaintiff's physical exam showed normal muscle strength and tone and normal gait and station.  His mental status exam showed normal findings and a "better" mood.  He was diagnosed with major depressive disorder, recurrent, moderate; unspecified anxiety disorder; and unspecified housing and economic problem. (ECF No. 10, p. 406).  His treatment plan was to continue Escitalopram, start Bupropion, and consider individual therapy.[5]  (ECF No. 10, p. 407).

On August 24, 2017, interviewer V. Ta completed the Plaintiff's field office disability report in person and observed that Plaintiff had no difficulty hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using hands, or writing.  (ECF No. 10, pp. 236-38).  Interviewer Ta described the Plaintiff as having no physical or mental limitations.  (ECF No. 10, p. 237).

In September 2017, Plaintiff reported to his therapist that he was not experiencing any dissatisfactions and that his earlier problems were induced by his medications.  (ECF No. 10, p. 829).  He reported that he was feeling markedly better and coping well with past problems and present stressors since his medications were adjusted.  (ECF No. 10, p. 829).

---

[4] Accu-Chek Aviva is a blood glucose meter.  *See* Accu-Chek Aviva, at https://www.accu-chek.com/meters (last accessed January 4, 2021).  Gabapentin is used to relieve nerve pain.  *See* Gabapentin, at https://medlineplus.gov/druginfo/meds/a694007.html (last accessed January 4, 2021).  Ketotifen is an antihistamine for the eye.  *See* Ketotifen, at https://medlineplus.gov/druginfo/meds/a604033.html (last accessed January 4, 2021). Ondansetron is used to prevent nausea and vomiting.  *See* Ondansetron, at https://medlineplus.gov/druginfo/meds/a601209.html (last accessed January 4, 2021).

[5] Bupropion is used to treat depression.  *See* Bupropion, at https://medlineplus.gov/druginfo/meds/a695033.html (last accessed January 4, 2021).

On September 16, 2017, Plaintiff completed a pain questionnaire report.  (ECF No. 10, pp. 242-43).  He reported suffering from unusual fatigue since 2004 and requiring a two-hour nap once a day.  He reported constant neck, lower back, lower leg, and foot pain or burning.  The pain was caused by walking and standing, though he could stand and walk for one to three hours and sit for two to four hours before the pain would occur.  Walking and lying on his back made his pain worse and nothing helped the pain.  He reported taking Gabapentin with no side effects.  (ECF No. 10, p. 243).

Plaintiff also completed a function report in September 2017.  (ECF No. 10, pp. 244-51).  He reported that his ability to work was limited by an inability to stand for more than three hours and his experience of numbing and cramping in legs.  His daily activities included feeding the dog, washing the dishes, and doing laundry.  (ECF No. 10, p. 244).  His mother, with whom he lived, helped him care for his dog.  Since the onset of his conditions, he could no longer drive a semi-truck, work for eight hours, or work on the family farm.  He had no problems with personal care and did not need any reminders to take care of his personal needs.  (ECF No. 10, p. 245).  Though he needed to make a note to remind himself to take his medication, he prepared his own meals daily.  He did not cook meals taking longer than 30 minutes due to inability to stand extensively.  (ECF No. 10, p. 246).

He reported going outside two to three times daily.  He could ride in a car and go out independently, however, he did not drive as his eyesight was affected by his diabetes.  He could manage his finances independently.  (ECF No. 10, p. 247).  He watched TV every day and attended church weekly.  ((ECF No. 10, p. 248).  He did not have problems getting along with others but did not engage in social activities anymore due to pain in back and legs.  (ECF No. 10, p. 249).

He reported problems lifting, standing, walking, sitting, stair climbing, kneeling, squatting, reaching, seeing, bending, memory, concentration, and completing tasks.  He reported that he could lift five pounds, climb three steps of stairs, and walk 50 yards, but he could not bend, stand, kneel, squat, sit, or reach due to pain.  He could pay attention for 45 minutes and follow written and spoken instructions.  (ECF No. 10, p. 249).  He could get along well with authority figures but did not handle stress or changes in routine well.  He reported being unusually moody and using a cane, hearing aid, and glasses.  His cane was not prescribed by a doctor, but his glasses and hearing aids were prescribed in 2007.  (ECF No. 10, p. 250).  He reported taking Gabapentin, Bupropion, Escitalopram, Novolog, and Lantus with no reported side effects.[6]  (ECF No. 10, p. 251).

On September 27, 2017, state agency physicians Margaret Podkova, Psy.D., and Karmen Hopkins, M.D., reviewed the Plaintiff's medical records.  (ECF No. 10, pp. 71-84).  Plaintiff's primary severe medically determinable impairment was spine disorders.  His secondary severe medically determinable impairment was depressive, bipolar, and related disorders.  His other severe medically determinable impairments were other retinal disorders, including diabetic retinopathy; diabetes mellitus; and anxiety and obsessive-compulsive disorders.  Dr. Podkova conducted the psychiatric review technique for depressive, bipolar, and related disorders and anxiety and obsessive-compulsive disorders.  Dr. Podkova found that the Plaintiff was only moderately impaired in his ability to interact with others and concentrate, persist, or maintain pace. (ECF No. 10, pp. 75-76).

Dr. Hopkins assessed Plaintiff's physical residual functional capacity.  (ECF No. 10, pp. 77-79).  She found that Plaintiff could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds.  Plaintiff could stand, walk, and sit about six hours in a workday.  He was limited

---

[6] Lantus is a long-acting, manmade version of human insulin used to treat people with diabetes. *See* Lantus, at https://medlineplus.gov/druginfo/meds/a600027.html (last accessed January 4, 2021).

in bilateral reaching overhead.  (ECF No. 10, p. 78).  Based on the medically determinable impairment of cervical degenerative disc/joint disease without myopathy and diabetic neuropathy without weakness or sensory loss, Dr. Hopkins opined that the medical evidence of record supported an RFC of light with no overhead reaching.  (ECF No. 10, pp. 77-79).

Dr. Podkova assessed Plaintiff's mental residual functional capacity.  (ECF No. 10, pp. 79-82).  She found that Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, and accept instructions and respond appropriately to criticism from supervisors.  Dr. Podkova noted the Plaintiff's recent diagnosis of depression and anxiety and recent mental health treatment with improvement.  She noted that Plaintiff remained somewhat symptomatic, but the residual psychiatric symptoms were less than markedly limiting.  Dr. Podkova concluded that the medical evidence of record supported capacity for work where interpersonal contact is only incidental to the work performed, complexity of tasks is learned and performed by rote with few variables and little judgment, and required supervision is simple, direct, and concrete—unskilled.  (ECF No. 10, p. 81).

In October 2017, after tests showed elevated glycosylated hemoglobin, Plaintiff was advised to continue Lantus, Novolog, and Metformin, watch his diabetic diet closely, and exercise daily.  (ECF No. 10, p. 785).  When Plaintiff's A1C levels increased between July 2017 and September 2017, Plaintiff reported the increase was due to eating things he knew he should not eat.  (ECF No. 10, p. 805).  He reported that he was doing better after his medications were adjusted

in August; however, he was not able to stay on his feet for very long without his legs going numb. He reported having to sit down for the feeling to return in his legs.  (ECF No. 10, p. 805).

He reported angina for the past six or seven months on the right side of his chest when he would sit or lie down.  He also complained of occasional pitting edema in ankles and feet that would resolve within one and half hours after staying off his feet.  (ECF No. 10, p. 807).  He reported abdominal pain mostly while eating and problems with bowel movements.  He also complained of difficulty balancing in the shower where he used handrails.  He complained of joint pain in bilateral feet and the right shoulder as well as back pain in the kidney area.  (ECF No. 10, p. 807).  As to his mental health, he described his depression as getting better.  (ECF No. 10, p. 816).  He was happy with his medication, his anxiety was much better, and being outside and getting out of the house improved his mood and anxiety.  (ECF No. 10, p. 820-21).

In November 2017, Plaintiff exhibited low blood sugars.  (ECF No. 10, p. 783-84).  He reported that his eating habits had changed and that his blood sugars had been lower since getting back on Metformin.  He also reported working in the barn lately, so his activity level had increased. (ECF No. 10, p. 783).  He was advised to increase his carbohydrates on active days.  He denied any health needs, symptoms, or concerns.  He stated that he was doing well.  (ECF No. 10, p. 783).

In December 2017, the treating dietician noted that Plaintiff's diabetes mellitus was clearly uncontrolled.  (ECF No. 10, p. 763).  She concluded that Plaintiff's dietary intake was contributing to this.  She discouraged his regular intake of soft drinks, reiterated the need for more consistency in diet, and emphasized the need to be aware of all carbohydrates in foods, especially soft drinks, sweets, and pasta.  (ECF No. 10, p. 763).  During his mental health follow up, Plaintiff reported no pain with a pain score of zero.  (ECF No. 10, p. 768).  He reported that his mood was good, and his depression was better.  He reported no side effects from medications.  (ECF No. 10, p. 770).

In January 2018, Plaintiff exhibited elevated blood sugar.  (ECF No. 10, p. 759).  He stated his blood sugar was high due to a sinus sickness that caused him not to eat.  The treating physician discussed the importance of eating three meals a day to maintain a steady blood sugar.  (ECF No. 10, p. 759).  He reported that he tried to improve his diet and that his blood sugar was higher when he did not eat.  He believed he got enough exercise because he worked outside.  (ECF No. 10, p. 760).

In February 2018, Plaintiff sought treatment for skin peeling from his feet without cracking or dryness.  (ECF No. 10, p. 744).  These symptoms were a side effect of his diabetes.  The treating physician advised Plaintiff to elevate his feet as needed and wear comfortable shoes.  The mental status exam showed that Plaintiff was alert and oriented.  He reported no stress, depression, or suicidal ideation.  He arrived ambulatory and did not use an assistive device.  His mobility had not changed in the past three months.  (ECF No. 10, p. 744).  His nutrition status was mildly compromised, though somewhat improved.  (ECF No. 10, p. 748).

At his mental health follow up appointment for anxiety and depression, Plaintiff reported that he had been taking his medications with no issues.  (ECF No. 10, p. 751).  He was continued on Escitalopram, Gabapentin, Bupropion, and Melatonin.  (ECF No. 10, p. 752).  He reported that Gabapentin helped his sleep and pain.  (ECF No. 10, p. 753).  His medical problem list included noncompliance with treatment, anxiety, major depression, diabetes mellitus, and shoulder pain.  (ECF No. 10, p. 753).  He denied back pain, joint pain, or joint deformity, and the musculoskeletal exam showed normal muscle strength and tone and normal gait and station.  (ECF No. 10, p. 754).  His mental status exam showed a fine mood with congruent affect, normal motor function, normal speech, linear and goal directed thought process, intact associations, alert orientation, intact

memory, average concentration, intact language, average fund of knowledge, and intact judgment and insight.  (ECF No. 10, p. 755).

On February 20, 2018, Plaintiff completed a second function report.  (ECF No. 10, pp. 261-68).  He reported continued pain in his back, legs, and feet.  He reported only watching TV and sleeping all day.  He could no longer bend over when dressing or bathing but otherwise remained capable of completing personal care and taking medication without the need for reminders.  He prepared his own meals on a weekly basis and completed laundry twice a week.  He reported he did not need help or encouragement to do laundry, though he could only stand for a few minutes at a time. (ECF No. 10, pp. 263).  He would go walking outside once a day, but he could no longer go out on his own because he could not walk or stand very long.  He reported no longer going anywhere due to constant back and leg pain.  He reported being able to lift just 10 pounds, walk 50 yards, stand 10-15 minutes, and sit 30 minutes.  (ECF No. 10, p. 266).  He reported using a walker along with a cane, both prescribed by a doctor.  (ECF No. 10, p. 267).

On February 27, 2018, Plaintiff completed a second pain questionnaire report.  (ECF No. 10, pp. 269-70).  He reported that he needed to nap for one or two hours twice or more per day. The pain never subsided in his neck, lower back, lower legs, and feet.  He could stand or walk for up to 10 minutes but sit only five minutes.  He reported taking Novolog, Lantus, Escitalopram, Bupropion, and Atorvastatin with no side effects.[7]  He reported Gabapentin caused drowsiness. (ECF No. 10, p. 270).

On March 12, 2018, state agency physicians Christal Janssen, Psy.D., and Ronald Crow, D.O., reviewed the Plaintiff's medical records upon reconsideration based on pain and physical issues.  (ECF No. 10, pp. 102-16).  Dr. Crow affirmed the initial physical RFC rating.  Dr. Janssen

---

[7] Atorvastatin is used together with diet, weight loss, and exercise to reduce the risk of heart attack.  *See* Atorvastatin, at https://medlineplus.gov/druginfo/meds/a600045.html (last accessed January 4, 2021).

considered the medical evidence of record at reconsideration and noted documentation of physical issues, depression, and anxiety. Dr. Janssen affirmed the initial mental RFC rating. (ECF No. 10, pp. 109-13).

In March 2018, Plaintiff exhibited elevated blood sugar. (ECF No. 10-1, p. 435-36). He stated that he had not been eating much as he had been sick. His primary care team discussed his diet and advised him to count his carbohydrates and limit his intake of concentrated sweets. (ECF No. 10-1, p. 435-36). The treating physician noted that his medications were not being filled consistently and asked if Plaintiff was still taking them. Plaintiff stated he was taking all his medications regularly. He was also advised regarding his diabetic diet and daily exercise. (ECF No. 10-1, p. 436).

In April 2018, Plaintiff's primary care team at the VA expressed concern that his A1C levels have been elevated for the past two years. (ECF No. 10-1, p. 409). He was asked if he fully intended, and would be committed, to making the necessary lifestyle changes, activity, and diet changes, as well as complying with medical recommendations to try to slow the progression of the disease. He reported that he was ready to make changes as he no longer felt well, and the VA referred him to Mercy Clinic Endocrinology. (ECF No. 10-1, p. 410).

In May 2018, Plaintiff established care with family medicine practitioner Dr. Steven Forrest. (ECF No. 10, pp. 845-52). At their initial encounter, Plaintiff reported inability to sit for longer than 25 minutes without position change, inability to walk for more than 50 feet without stopping to rest with lower extremities going numb and giving way causing him to fall, inability to stand in one place for longer than five minutes, inability to stay lying flat for more than 15 minutes. (ECF No. 10, p. 846). He reported that he could sleep on his left or right side for one or two hours before getting up several times during the night.

The physical exam showed diminished hearing in left ear; back tender to palpation over lumbar-sacral spine; positive straight leg raising test bilaterally; cervical, thoracic, lumbar tenderness; and reduced and painful range of motion. (ECF No. 10, p. 847). His musculoskeletal exam showed decreased range of motion due to pain and inflammation; tenderness to palpation; and swelling. He exhibited logical and goal directed thought process. A sensory test of the foot revealed diminished sensations midcalf, decreased muscle tone bilaterally, and diminished strength. (ECF No. 10, p. 847).

Plaintiff was assessed with disabling back pain, neuropathy, frequent falls, impaired mobility and ADLs, depression, sleep disorder, hearing problem of the left ear, Type 2 Diabetes Mellitus with hyperglycemia, long term current use of insulin, and peptic ulcer disease. (ECF No. 10, p. 848). Plaintiff was also advised by his primary care team at the VA to eat consistent meals as his lack of appetite and consequential lack of eating meals was causing his glucose levels to be very low. (ECF No. 10-1, pp. 375-76). At his mental health follow up, Plaintiff endorsed multiple symptoms of depression, and his medications were subsequently adjusted. (ECF No. 10-1, pp. 384-85).

Also, in May 2018, Plaintiff sought treatment for complaints of constant right anterior chest pain that he believed was a panic attack. (ECF No. 10-1, p. 389). He was assessed with atypical chest pain but had normal radiographs of the chest. (ECF No. 10-1, p. 393). He was also assessed with poor control of his diabetes, for which he was given IVF and insulin, and advised of his diet and medications. (ECF No. 10-1, p. 393).

On June 12, 2018, Dr. Steven Forrest completed a physical medical source statement and RFC assessment for a period beginning May 9, 2018. (ECF No. 10, pp. 849-51). Dr. Forrest assessed that Plaintiff could frequently and occasionally lift only less than 10 pounds. He could

stand or walk just two hours total in an eight-hour workday and continuously for one hour.  He could sit for a total of just two hours and continuously for just two hours.  His push and pull abilities were limited in both upper and lower extremities.  He required four or more breaks during a typical workday and would need to lay in a supine position for a total of two hours.  He would be able to perform work activities for one hour of the normal workday and continuously for just half an hour.  Dr. Forrest stated that these limitations were based an objective finding of limited, painful range of motion and activity intolerance.  (ECF No. 10, p. 849).

Plaintiff's ability to climb, balance, squat, kneel, crouch, bend forward or stoop, and finger was limited to less than two hours a workday.  (ECF No. 10, p. 850).  He could reach in all directions, handle, grip, and feel for just two hours.  Dr. Forrest also assessed that Plaintiff must avoid concentrated exposure to extreme cold or heat; wetness or humidity; noise or vibration; fumes, odors, dust, gases, poor ventilation; and hazards.  These limitations were based on clinical and laboratory findings or symptoms of painful and reduced range of motion.  Plaintiff's diagnoses were neuropathy; frequent falls; depression; sleep disorder; type 2 DM long term use of insulin; PMD; hearing problem in left ear; impaired mobility and ADL's; and disabling back pain.  (ECF No. 10, p. 850).

As to Plaintiff's functional abilities in a work environment, Dr. Forrest opined that in an eight-hour workday, the Plaintiff could not sit for six hours, sit/stand/walk in combination for eight hours, or perform part-time work activities of any nature for more than ten hours in a forty-hour workweek.  (ECF No. 10, pp. 851).  He would also require four or more unscheduled work breaks due to physical restrictions.  His bilateral upper extremities were significantly limited in reaching, pushing, and pulling.  He also had significant limitations in the ability to handle and work with small objects with both hands.  (ECF No. 10, pp. 851).

On June 12, 2018, Dr. Forrest also completed a mental RFC assessment of the Plaintiff for a period beginning May 9, 2018.  (ECF No. 10, p. 852).  Using a checklist form, Dr. Forrest assessed that Plaintiff was unable to effectively stay on pace in a work setting for at least 85% of the workday; adhere to a schedule, maintain regular attendance, or be punctual consistently; perform at a consistent pace without an unreasonable number and length of rest periods; function independently; demonstrate reliability; work without deterioration or decompensation causing exacerbation of symptoms.  (ECF No. 10, p. 852).

In June 2018, Plaintiff presented for his referral to Mercy Clinic Endocrinology for uncontrolled diabetes mellitus.  (ECF No. 10-1, pp. 458-59).  His physical exam showed regular heart rate and rhythm, normal extremities with equal movement, no edema, no tenderness in calves or thighs, normal strength, and tone.  He was alert and oriented with normal symmetric reflexes, normal coordination, and normal gait.  (ECF No. 10-1, p. 460-61).  His diabetic foot exam showed no ulceration or callous formation, abnormal monofilament testing, no sensation bilaterally, and normal pulses bilaterally.  (ECF No. 10-1, p. 461).  He was assessed with poorly controlled diabetes mellitus type 2 that needed improvement.  He was to continue Metformin, Lantus, and Novolog and to start Victoza.[8]  He was advised that Victoza could result in side effects of nausea and vomiting that may gradually resolve within four weeks.  He was to continue Gabapentin for diabetic neuropathy.  He was advised to check his glucose levels four times daily.  (ECF No. 10-1, pp. 461-62).

In July 2018, Mercy Clinic Endocrinology described the Plaintiff's diabetes as poorly controlled but improving.  (ECF No. 10-1, p. 484).  He reported no problems taking Victoza and he was reminded to take his insulin consistently.  (ECF No. 10-1, p. 484).

---

[8] Victoza is used with a diet and exercise program to control blood sugar levels in people with type 2 diabetes.  *See* Victoza, at https://medlineplus.gov/druginfo/meds/a611003.html (last accessed January 4, 2021).

In August 2018, Plaintiff had a follow up appointment for depression and anxiety during which he reported a good mood and less anxiety, but poor sleep, anhedonia, low energy, and overeating. (ECF No. 10-1, pp. 292-93). His mental status exam showed an affect congruent with his stated mood, normal speech, linear and goal directed thought process, intact associations, intact memory, average attention, and intact judgment and insight. (ECF No. 10-1, p. 296). Plaintiff's A1C test results, however, showed very poor control of diabetes. (ECF No. 10-1, p. 298). The treating physician instructed the Plaintiff to increase his Lantus dosage, continue his other medications, watch his diet, and get regular exercise. (ECF No. 10-1, p. 298-99). His treating dietician noted that the Plaintiff's eating patterns showed no real diet or lifestyle change and that he did not appear ready for long-term lifestyle change. (ECF No. 10-1, p. 309-10).

In September 2018, Plaintiff sought treatment for a headache lasting two weeks, vomiting for several days, and blurry vision. (ECF No. 10-1, p. 257). He reported going to the emergency department where he received two IVs and got his blood sugar down to 123. (ECF No. 10-1, p. 259). The treating physician advised Plaintiff that his food choices needed to respond to his glucose levels, such as eating carbohydrates when his glucose is low. Upon review of the Plaintiff's recent food choices and glucose levels, the treating physician advised the Plaintiff that eating eggs when his glucose was low did not provide him with the carbohydrates he needed. He further advised the Plaintiff that he should not take Novolog if he is not planning to eat as it will precipitously drop his glucose too low. The Plaintiff was encouraged to eat steady meals. (ECF No. 10-1, p. 261). His physical exam showed active range of motion of the joints without lumbar tenderness. (ECF No. 10-1, p. 269). A CT scan of his head following complaints of a headache showed normal findings. (ECF No. 10-1, p. 273). A study of his chest and abdomen showed no

evidence of obstruction or pneumoperitoneum and no acute cardiopulmonary disease.  (ECF No. 10-1, pp. 897-98).

In October 2018, Plaintiff's blood sugar was elevated.  (ECF No. 10-1, p. 192).  He reported that he had been sick lately and was not eating normally.  The treating RN refilled Plaintiff's glucose tablets prescription and discussed his eating plan.  (ECF No. 10-1, p. 192).  He also reported lower leg and foot pain at level 6/10.  (ECF No. 10-1, p. 208).  He reported problems with showering, repositioning in bed, and walking at times.  He stated that his dental problems caused his blood sugars to go over 500.  (ECF No. 10-1, pp. 208-09).  He reported using a cane 90% of the time.  He had difficulty holding and lifting things.  (ECF No. 10-1, p. 210).  His treating physician noted elevated A1C levels and advised the Plaintiff to stop drinking soft drinks but continue making good food choices.  (ECF No. 10-1, pp. 221-22).

Mercy Clinic Endocrinology described the Plaintiff's diabetes as poorly controlled but improving, and the Plaintiff complained of neuropathy and foot pain.  (ECF No. 10-1, pp. 498-99). He was advised to continue his medications and start Jardiance.[9]  (ECF No. 10-1, p. 499). Plaintiff's primary care nurse at the VA noted the Plaintiff's elevated heart rate (ECF No. 10-1, p. 846); however, Plaintiff reported that he was feeling fine and denied chest pain or shortness of breath (ECF No. 10-1, p. 846).  He complained of exhaustion during the day, and he was advised that elevated blood sugars can cause exhaustion.  (ECF No. 10-1, pp. 857-58).

In November 2018, Plaintiff was cleared for activity such as walking, light to moderate activities, and light restrictive work with TheraBands and up to three-pound weights.  (ECF No. 10-1, p. 46).  Plaintiff's treating physician noted that his microalbumin was elevated, meaning his

---

[9] Jardiance is used along with diet and exercise, and sometimes with other medications, to lower blood sugar levels in people with type 2 diabetes.  *See* Jardiance, at https://medlineplus.gov/druginfo/meds/a614043.html (last accessed January 4, 2021).

diabetes had caused kidney damage that was leaking protein into his urine in small amounts.  He was prescribed Lisinopril to protect his kidneys from diabetes-induced damage, advised to keep watching his diet, exercise regularly, and continue current medications.[10]  (ECF No. 10-1, pp. 148).

On November 27, 2018, Plaintiff sought treatment at the emergency department following syncope, fall, and head injury on November 24, 2018.  (ECF No. 10-1, pp. 149-59).  He reported a level 5/10 headache and very blurred vision.  He reported a history of passing out for the past year and a half.  (ECF No. 10-1, p. 153).  After an interfacility transfer for higher level of care in cardiology, Plaintiff reported he was chest pain free and his symptoms had resolved.  (ECF No 10-1, p. 1090).  He reported that he had a history of syncopal episodes.  The ER nurse noted that the Plaintiff was a noncompliant diabetic and often had problems with elevated blood glucose.  (ECF No. 10-1, p. 1116).

At his follow up for anxiety/depression, Plaintiff reported that he had been doing all right and taking his medications; he reported no pain.  (ECF No. 10-1, pp. 170).  He stated that his depression was better and that his medication changes had helped a lot.  (ECF No. 10-1, p. 171).

Mercy Clinic Endocrinology described the Plaintiff's diabetes as poorly controlled but improving and noted that he reported no problems with Jardiance.  (ECF No. 10-1, p. 515).  His primary care physician with the VA noted that his A1C was 10.2, which was a significant improvement from 11.1 in early October.  (ECF No. 10-1, p. 775).

In December 2018, Plaintiff's A1C levels were elevated and uncontrolled, though somewhat improved.  (ECF No. 10-1, p. 47).  Though he had a small refrigerator where he kept his insulin, Plaintiff stated that he was essentially homeless and eating from cans.  The treating dietician advised him to obtain items from local food pantries to supplement the foods he

---

[10] Lisinopril is used to treat high blood pressure.  *See* Lisinopril, at
https://medlineplus.gov/druginfo/meds/a692051.html (last accessed January 4, 2021).

purchased.  He was educated on maintaining a balanced, consistent diet using foods that did not require refrigeration while saving space in the refrigerator for other foods to balance out his diet. He was educated on meal combinations that would be balanced and adequate in carbohydrates. (ECF No. 10-1, pp. 48-49).  He reported that he was hospitalized for three days following a period of stress that resulted in him leaving home.  He reported that his heart rate was in the 120's-130's when hospitalized.  (ECF No. 10-1, pp. 136-41).

In January 2019, Mercy Clinic Endocrinology described the Plaintiff's diabetes as poorly controlled that needed improvement following a period of homelessness during which he was not able to eat properly.  (ECF No. 10-1, p. 531).  Plaintiff reported that he had found a place to live and planned to resume cooking his meals.  (ECF No. 10-1, p. 531).

Plaintiff was assessed with mild non-proliferative diabetic retinopathy in both eyes with non-clinically significant macular edema in the left eye; allergic conjunctivitis/dry eye syndrome; and refractive error with presbyopia.  (ECF No. 10-1, pp. 89-92).  Other than artificial tears, no other treatment was administered; instead, diabetic eye disease was discussed.  Plaintiff voiced understanding of the importance of good blood sugar control, and he reported compliance with medications.  (ECF No. 10-1, p. 92).  Though his A1C levels had increased since October, he reported that he had found housing and was getting back on track with his diet.  (ECF No. 10-1, p. 94).  His goals and care coordination intervention plan included increased exercise, re-education on diabetic diet, and lowered blood sugar levels.  (ECF No. 10-1, p. 95).

In February 2019, Plaintiff reported that he was feeling better after an elevated blood sugar of 274.  (ECF No. 10-1, p. 87).  He stated he was starting to watch his diet and eat more vegetables, and thus, his blood sugars were coming down.  He reported that he expected to continue to improve as he had been going out walking.  He was advised to continue his diabetic diet, exercise as

tolerated, take all medications as directed, and keep all VA medical appointments. (ECF No. 10-1, p. 87). Mercy Clinic Endocrinology described the Plaintiff's diabetes as poorly controlled but improving. (ECF No. 10-1, p. 548). He was advised to continue Metformin, Victoza, and Jardiance and to increase Lantus and Novolog. (ECF No. 10-1, p. 548).

In March 2019, Plaintiff sought treatment for left elbow pain, low back pain, and some right leg pain. (ECF No. 10-1, pp. 79-81). The treating physician noted that Plaintiff's diabetes was uncontrolled, which could be associated with joint pain. (ECF No. 10-1, p. 81). Plaintiff stated that he missed an insulin shot, which caused his elevated blood sugar, and he was trying to control his diet and was feeling better. (ECF No. 10-1, p. 83).

Plaintiff followed up with Mercy Clinic Endocrinology and reported that he was monitoring his glucose levels just once per day. (ECF No. 10-1, pp. 557-61). He reported no problems taking Jardiance. (EF No. 10-1, pp. 561-62). His diabetes was described as poorly controlled but improving. (ECF No. 10-1, p. 563). The importance of checking his blood sugars more often was stressed, and he agreed to do better. His blood pressure was elevated, and he explained that he had not taken his blood pressure medication yet. He was advised to take his medication first thing in the morning. (ECF No. 10-1, p. 563).

In April 2019, the Mercy Clinic Endocrinology clinic heartily congratulated Plaintiff for getting his A1C down from 11.1% to 9.9%. (ECF No. 10-1, p. 579). His diabetes was described as uncontrolled but improving. His blood pressure was also at goal. He was scheduled for follow up in three months. (ECF No. 10-1, p. 579).

Plaintiff reported that he had moved out of his mother's house and was living on his own. (ECF No. 10-1, p. 680). He reported the ability to care for his personal needs, including doing his own cooking and cleaning, though he used a cane and a shower chair. He reported that his

depression was getting better, though he could not stay on his feet for very long.  He reported that he could still drive but usually had a friend pick him up to go places.  (ECF No. 10-1, p. 680).  He described his pain as level 4-5/10 in his lower legs and feet.  (ECF No. 10-1, p. 681).  He worked outside sometimes but had occasional chest pains.  (ECF No. 10-1, pp. 696-98).  He reported falling from his roof the previous month, though the radiology report of his left elbow showed no acute fracture, subluxation or dislocation, joint effusion, or radiopaque foreign body.  (ECF No. 10-1, p. 589).

On May 13, 2019, orthopedist, Dr. Robert Tomlinson conducted a physical RFC assessment of the Plaintiff for a period beginning April 17, 2019.  (ECF No. 10-1, pp. 1151-52).  Using a checklist form, Dr. Tomlinson assessed that in a typical eight-hour workday Plaintiff was limited to occasionally lifting or carrying less than 10 pounds; standing or walking a total of two hours; and sitting a total of four hours.  Plaintiff's pushing and pulling were limited in his lower extremities, and he had to elevate his lower extremities twice a day.  In a typical workday, he would need five or more breaks and must stay in a supine position for one hour.  He could perform work activities for only two hours of a normal workday and would need four or more absences in a normal work month.

Dr. Tomlinson further assessed that Plaintiff was limited to less than two hours of climbing, balancing, squatting, kneeling, crouching, bending, stooping, reaching in all directions, handling, fingering, gripping, and feeling.  Plaintiff must also avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards.  Dr. Tomlinson based these limitations on the Plaintiff's insulin dependent diabetes, major depressive disorder, and lumbar spondylosis.  (ECF No. 10-1, pp. 1151-52).

On May 12, 2019, psychiatrist, Dr. Tiffany Mattingly, conducted a mental RFC assessment of the Plaintiff for a period beginning August 16, 2017. (ECF No. 10-1, pp. 1158-59). Using a checklist form, Dr. Mattingly assessed that Plaintiff had no useful ability on a sustained basis to respond appropriately to supervision, co-workers, and usual work settings; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; behave in an emotionally stable manner; relate predictably in social situations; or, work without deterioration or decompensation causing the individual to withdraw from the situation or to experience exacerbation of symptoms or adaptive behaviors. (ECF No. 10-1, pp. 1158-59). Plaintiff's diagnoses were major depressive disorder and unspecified anxiety disorder. Dr. Mattingly based these limitations on clinical observations, signs, and symptoms and patient history. (ECF No. 10-1, pp. 1158-59).

### III.   Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin,* 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because

substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id.*

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Only if he reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138,

1141-42 (8th Cir. 1982), *abrogated on other grounds by Higgins v. Apfel*, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure his decision is an informed decision based on sufficient facts. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). However, the ALJ is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record. *Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir. 2014) (quoting *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994). While "[a]n ALJ should recontact a treating or consulting physician if a critical issue is undeveloped," "the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quotation, alteration, and citation omitted).

RFC is the most a person can do despite that person's limitations. 20 C.F.R. §§ 404.1545, 416.945. A disability claimant has the burden of establishing his RFC. *Vossen,* 612 F. 3d at 1016. "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Miller*, 784 F.3d at 479 (citing *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001)). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

## IV.    Discussion

Plaintiff raises four issues on appeal: (1) whether the ALJ fairly and fully developed the record; (2) whether the ALJ erred at steps two and five of the sequential analysis; (3) whether substantial evidence supports the ALJ's symptom evaluation; and (4) and whether substantial evidence supports the ALJ's RFC finding.  After thoroughly reviewing the record, we find that the ALJ failed to develop the record fairly and fully, and therefore, it does not provide substantial evidence to support the RFC finding.  Because this failure already necessitates reversal and remand, it is not necessary for the undersigned to address the Plaintiff's remaining arguments.

"Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." *Vossen*, 612 F.3d at 1016 (quoting *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004)).  "Failing to develop the record is reversible error when it does not contain enough evidence to determine the impact of a claimant's impairment on [his] ability to work." *Combs v. Berryhill*, 878 F.3d 642, 647 (8th Cir. 2017) (citing *Byes v. Astrue*, 687 F.3d 913, 915-16 (8th Cir. 2012)).

The ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000).  The RFC must, however, be supported by "some medical evidence," and the ALJ should obtain evidence that addresses the claimant's "ability to function in the workplace." *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000); *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000).  "An ALJ must not substitute his opinions for those of the physician." *Finch v. Astrue*, 547 F.3d 933, 938 (8th Cir. 2008) (quoting *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990)).  An ALJ is not permitted to "play doctor." *Pates-Fires v. Astrue*, 564 F.3d 935, 946-47 (8th Cir. 2009).

The opinion of a non-examining physician, standing alone, does not constitute substantial evidence in the record in the face of a conflicting assessment of a treating physician. *Jenkins v. Apfel,* 196 F.3d 922, 925 (8th Cir. 1999). However, if the ALJ did not rely solely on the non-examining physician's opinion but also conducted an independent review of the medical evidence and other evidence, such as motivation to return to work and daily activities, then there is substantial evidence in the record to support the ALJ's RFC determination. *Krogmeier v. Barnhart,* 294 F.3d 1019, 1024 (8th Cir. 2002).

Here, in setting out the Plaintiff's RFC, the ALJ relied on the September 2017 and March 2018 assessments provided by state agency medical consultants. (ECF No. 10-1, pp. 23-24). The Plaintiff's two treating sources—family practice physician, Dr. Forrest, and orthopedic surgeon, Dr. Tomlinson—provided opinions regarding the Plaintiff's ability to function in the workplace in May 2018 and May 2019, respectively. The ALJ afforded little weight to both opinions.[11] (ECF No. 10-1, pp. 24-25). Further, there were no consultative examinations from other physicians, despite the Plaintiff's specific request that the ALJ order consultative examinations to assess the Plaintiff's limitations. (ECF No. 10, p. 301). Without the opinions of the treating physicians, the ALJ could rely only on his own inferences and the opinions of the non-examining state agency consultants.

While an "ALJ may consider all evidence of record, including medical records and opinions dated prior to the alleged onset date, when there is no evidence of deterioration or progression of symptoms," it is improper for an ALJ to rely on an opinion rendered, which given its timing, could not consider the subsequent medical records indicating a worsening of [a claimant's] symptoms and functionality. *LaFrance v. Astrue*, No. 09-403, 2010 WL 624202, at

---

[11] In this report and recommendation, we do not review the ALJ's decision to discredit the opinions of the treating physicians.

*14 (D. Minn. Feb. 22, 2010) (citing *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005)); *see also Wildman v. Astrue*, 596 F.3d 959, 967 (8th Cir. 2010) (opinions of non-examining sources are generally entitled to less weight than examining sources, especially when those opinions do not take into account all the pertinent evidence in the record). An ALJ errs in relying on his own inferences as to the relevance of notations in the medical record when determining a claimant's ability to function in the workplace. *See Combs v. Berryhill*, 878 F.3d 642, 647 (8th Cir. 2017) (remanding for further inquiry as to the relevance of "no acute distress" and "normal movement of all extremities" with respect to the plaintiff's ability to function in the workplace).

Here, a large part of the medical record occurs outside of the state agency consultants' scope of review, including specialized treatment for diabetes mellitus with Mercy Clinic Endocrinology beginning in June 2018. (ECF No. 10-1, pp. 450-588). Notably, the Plaintiff entered this specialized treatment program based on a referral from his primary care team at the VA following their concerns about his elevated A1C levels in April 2018. (ECF No. 10-1, p. 409). The Plaintiff was also hospitalized on two occasions for symptoms that appeared to be related to his glucose levels in September and November 2018. (ECF No. 10-1, pp. 257-59; 149-59)). The state agency consultants did not have the benefit of these treatment records when setting out their RFC assessments, and the opinions of the treating physicians as to the Plaintiff's limitations during this period were rejected by the ALJ. Essentially, the Plaintiff's ability to function in the workplace was not assessed by a physician after his conditions seemingly worsened to the point that specialized treatment and hospitalizations were required. We conclude, then, that the ALJ determined the Plaintiff's RFC without a medical opinion to support his assessment of a large part of the treatment record showing a worsening condition.

By rejecting the treating source opinions and failing to obtain a consultative examination, the ALJ had to rely solely on his inferences about notations in the Plaintiff's medical records and their relevance to his ability to function in the workplace.  To support his RFC finding, the ALJ pointed to treatment notes between September 2018 and April 2019 in which the Plaintiff's blood sugar levels remained elevated, while both improving and worsening at times.  (ECF No. 10, p. 22).  The ALJ referred to treatment notes describing the Plaintiff's diminished sensation to light touch in his feet and a prescription for a cane to use when walking, but also a normal gait and full strength in his lower extremities.  (ECF No. 10, p. 22)  Because an RFC is a medical question, the ALJ was not permitted to rely on his own interpretation of these treatment notes to arrive at the Plaintiff's RFC.

As such, the ALJ failed to develop the record fairly and fully, and therefore, the record does not provide substantial evidence to support the RFC finding.  Accordingly, the ALJ's decision is not supported by substantial evidence, and the case must be reversed and remanded.

On remand, the ALJ is directed to obtain RFC assessments from the Plaintiff's treating physicians, allowing the treating physicians the opportunity to provide an explanation for the limitations assigned should the ALJ have questions.  If those physicians are unwilling or otherwise unable to complete the RFC assessments, then the ALJ is directed to order a consultative examination, complete with a detailed RFC assessment of the Plaintiff's limitations.  The ALJ should then reassess the Plaintiff's RFC, taking into account all of his impairments, and conduct a thorough step four and, if necessary, step five analysis.  Although the ALJ's decision may be the same after proper analysis, proper analysis must occur, nonetheless.  *Groeper v. Sullivan*, 932 F.2d 1234, 1239 (8th Cir. 1991).

**V.      Conclusion**

Based on the foregoing analysis, it is recommended that this case be reversed and remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).   The failure to file timely objections may result in waiver of the right to appeal questions of fact.  We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 14th day of January 2021.

/s/ Mark E. Ford
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE